Libby G. LYNCH, Plaintiff, Appellant,

v.

VICKERS ENERGY CORPORATION, Esmark, Inc., William A. Alexander, Richard J. Boushka, Edward J. Hudson, Donald P. Kelly, Robert D. Phillips, Stormy F. Smith and Jack A. Vickers, Defendants, Appellees.

Supreme Court of Delaware.

Submitted June 9, 1980.

Decided April 3, 1981.

Irving Morris and Joseph A. Rosenthal of Morris & Rosenthal, Wilmington, and Sidney B. Silverman (argued), Joan T. Harnes and Martin H. Olesh of Silverman & Harnes, New York City, of counsel, for plaintiff-appellant.

Louis J. Finger of Richards, Layton & Finger, Wilmington, and Leo Herzel, Susan Getzendanner (argued), and Scott J. Davis of Mayer, Brown & Platt, Chicago, Ill., of counsel, for defendants-appellees Vickers Energy Corp., Esmark, Inc., Richard J. Boushka, Donald P. Kelly, Robert D. Phillips and Jack A. Vickers.

David A. Drexler (argued) of Morris, Nichols, Arsht & Tunnell, Wilmington, and William Key Wilde of Bracewell & Patterson, Houston Tex., of counsel, for defendants-appellees William A. Alexander, Edward J. Hudson and Stormy F. Smith.

Before the Court en Banc: HERMANN, C. J., and DUFFY, McNEILLY, QUILLEN and HORSEY, J.

DUFFY, Justice:

This is a class action on behalf of stockholders of TransOcean Oil, Inc. (TransOcean) who sold their shares pursuant to a tender offer by the majority stockholder.[1]

1. During oral argument, we were advised by counsel that many members of the class have participated in a settlement of their respective claims in a companion suit in Illinois. While the remaining members of the class are not identified in the record, we understand from

The pertinent facts appear in a prior opinion of this Court, *Lynch v. Vickers Energy Corp.*, Del.Supr., 383 *A.2d* 278 (1977), and in two opinions by the Court of Chancery, 402 A.2d 5 (1979), and 351 A.2d 570 (1976), to which reference is made. We discuss the facts only as necessary for present purposes.

## I

A majority of the issued and outstanding stock of TransOcean is held by defendant Vickers Energy Corporation (Vickers), which is a wholly-owned subsidiary of defendant Esmark, Inc. (Esmark).[2] Vickers had acquired through the tender offer, at $12 each, some 4,228,000 additional shares of TransOcean common.

In the prior appeal, we held that:

"Vickers, as the majority shareholder of TransOcean, owed a fiduciary duty to plaintiff which required 'complete candor' in disclosing fully 'all of the facts and circumstances surrounding the' tender offer."

383 *A.2d* at 279. And we concluded that the tender offer made by Vickers to its fellow shareholders,

"failed to disclose fully two critical facts: (1) that a 'highly qualified' petroleum engineer . . ., who was a member of TransOcean's management, had calculated the net asset value to be worth significantly more than the minimum amount disclosed in the offer; and (2) that Vickers' management had authorized open market purchases of TransOcean's stock during the period immediately preceding the $12 per share tender offer for bids up to $15 per share."

383 *A.2d* at 280. We then remanded the case for further proceedings in the Court of Chancery consistent with our rulings.

After remand, trial was held on the remaining issues and the Court entered judgment for defendants. 402 *A.2d* 5 (1979). Plaintiff then docketed this appeal.

In his opinion, the Trial Judge considered several alternative measures of damages or formulas for relief and then, noting the absence of statutory guidelines, he concluded that:

"a proceeding analogous to an appraisal hearing such as is provided for in merger cases is appropriate here, *Poole v. N. V. Deli Maatschappij*, supra [Del.Supr., 224 A.2d 260 (1966)], in a situation in which active fraud has not been alleged or proved."

402 *A.2d* at 11. The Court then weighed and applied the several factors relevant to fixing the "fair" or "proper" value of shares in a statutory appraisal proceeding, 8 *Del.C.* § 262. See, e. g., *Universal City Studios, Inc. v. Francis I. duPont & Co.*, Del.Supr., 334 *A.2d* 216 (1975). Those factors are the value of the corporate assets, the market value of the stock and its earnings value. The Trial Judge then adjusted and summarized his findings of the value of each TransOcean share, as of the time of the tender offer, as follows:

| "Asset value | $ 17.50 x 40% | $ 7.00 |
| Market value | $ 9.48 x 40% | $ 3.80 |
| Earnings value | $ 5.25 x 20% | $ 1.05 |
| Total | | $ 11.85" |

402 *A.2d* at 12.

Since members of the class had been paid $12 per share for the TransOcean stock which they sold to Vickers, the Court concluded that plaintiff had not been damaged by defendants' failure to disclose the material facts, which was the basis of our reversal following the prior appeal. See 383 *A.2d* at 282.

In this Court, plaintiff argues that the Trial Judge erroneously interpreted and applied our decision on the first appeal; that uncontroverted trial testimony fixed the

---

counsel that about 200,000 shares did not participate in the settlement and are represented in this action. In this opinion, all references to "plaintiff" include members of her class, unless the text indicates otherwise.

2. We were advised also at argument that TransOcean had been merged into Esmark. For discussion purposes, we do not distinguish between Vickers and Esmark; unless the text indicates otherwise, reference to one includes the other.

value of the TransOcean shares to Esmark at up to $40 per share; that the Chancellor committed error in valuing and weighing TransOcean's net assets; and that he erroneously refused to order rescission.

Defendants respond by saying, among other things, that the Court of Chancery used the correct standard in determining whether plaintiff had been damaged by the failure to disclose the material facts; that the Court correctly applied that standard to the evidence; that the members of the class had been overpaid for the TransOcean shares; that plaintiff must show injury in order to be entitled to a remedy; and that rescission would be unwarranted in any event.

## II

As we see the controversy in context following our ruling on the first appeal, the issue remaining for decision is very narrow. In ultimate terms, it amounts to this: Is plaintiff entitled to relief and, if so, what is it to be?

The choice of relief to be accorded a prevailing plaintiff in equity is largely a matter of discretion with the Chancellor, 1 *Pomeroy's Equity Jurisprudence* (5 ed.) § 109, and Delaware, with its long history of common law equity jurisprudence, has followed that tradition. Cf. *Wilmont Homes, Inc. v. Weiler*, Del.Supr., 202 A.2d 576 (1964). Here, however, there is more to the appeal than merely testing for abuse of discretion. As we view it, the issue is not the manner in which the Court applied an agreed or undisputed measure of damages, but whether the Court followed a proper rule of law in deciding whether the members of plaintiff's class are entitled to relief.

We conclude that reversal is required because the Chancellor erroneously relied on the *Poole* case and on an appraisal formula (which has been developed in our case law under the Statute, 8 *Del.C.* § 262) in deter-

mining whether relief should be granted. In short, the case calls for a different rule of law on damages than the one which the Chancellor applied.

### A.

In *Poole*, the question raised was the measure of damages to be applied in an action for inducing a sale of stock by fraudulent misrepresentation. While the corporate defendant in that case (like Vickers in this case) held more than 50% of the stock in the corporation whose shares were acquired from the plaintiffs, *Poole* was tried as a misrepresentation case in which the nature of the relief sought was significant and, as to that, this Court said:

> "[P]laintiffs seek to recover the difference between the actual value of the stock and the price paid, known as the 'out-of-pocket' measure of damages . . . ."

224 *A.2d* at 262. Indeed, the relief sought by plaintiffs was determinative because the Court, after noting other measures of damages, said:

> "In any event, since the plaintiffs' action is grounded upon the out-of-pocket measure of damages, that is the rule to be applied."

224 *A.2d* at 262.

Clearly, then, *Poole* was pleaded and tried as a fraud case in which the Court limited plaintiffs to the out-of-pocket measure of damages on which they had gone to trial, 224 *A.2d* at 262, and then applied the general rule used in determining the "actual value of stock" involved in a fraud case.[3] In so doing, the Court used a corporate "going concern" basis and rejected a claim that a "liquidation" basis was appropriate. 224 *A.2d* at 263.

The question, then, is whether the *Poole* approach should be applied here. We think not, for at least one significant reason: a

---

**3.** The Court said:

"The general rule is that in determining the actual value of stock, consideration should be given to the various relevant factors of value including earnings, dividends, market price, assets, and any other pertinent factors on a 'going concern' basis. This is the rule in fraud cases."

224 *A.2d* at 263.

breach of fiduciary duty was alleged in this litigation and it was found by this Court, 383 *A.2d* at 281, but such a claim was neither charged nor found in *Poole*. Given that distinction, we are not persuaded that plaintiff and the members of her class should be limited to the measure of damages which the plaintiffs had pleaded and tried in *Poole* and which the Chancellor applied here.

A rule derived from a case in which the Court accepted a damage formula for which the plaintiffs had specifically asked, may not, in fairness, be applied to limit the present plaintiff whose claim is based, not on a similar cause of action nor on the same damage formula, but on the violation of a different standard of conduct. The difference is important because the appraisal approach adopted in *Poole* has a built-in limitation, namely, gain to the corporation resulting from a statutory merger is not a factor which is included in determining the value of the shares, and it was not considered by the Chancellor. But that limitation does not apply when a fiduciary has breached a duty to those to whom it is owed.

■ We do not overrule *Poole*, which remains appropriate for an action based on misrepresentation. But a claim founded on a breach of fiduciary duty permits a different form of relief, that is, an accounting or rescission or other remedy afforded for breach of trust by a fiduciary.

### B.

We now consider what relief is appropriate. Plaintiff has prayed for both rescission and money damages and the theory of the claim asserted would support a judgment in either form. Thus rescission would restore the parties to the *status quo* before sales of the shares were made, and money damages for non-disclosure of information germane to the transactions is akin to a legally based action for fraud and deceit. Compare *Poole*, supra.

As to rescission, plaintiff has argued that the members of her class should be given the option, on an individual basis, to rescind their respective sales. There is precedent for such a ruling because our Court of Chancery has ruled that materially misleading representations, which induce a party to contract, may entitle that party to rescind the contract. *Eastern States Petroleum Co., Inc. v. Universal Oil Products Co.*, Del. Ch., 24 Del.Ch. 11, 3 A.2d 768 (1939); cf. *Brittingham v. Huyler's*, N.J.Ch., 118 N.J.Eq. 352, 179 A. 275 (1935), aff'd, N.J. Ct.E. & A., 120 N.J.Eq. 198, 184 A. 529 (1936). Rescission is the preferable remedy and if the controversy in its present form had been here in an earlier stage of the litigation, it might well be ordered. But we conclude that rescission is not feasible at this late date. TransOcean has been merged into Esmark and time has brought other corporate changes.

■ On the present state of affairs, we conclude that a fair result can be accomplished without interfering with the present corporate structure through a rescission order. That can be accomplished by ordering damages which are the monetary equivalent of rescission and which will, in effect, equal the increment in value that Vickers enjoyed as a result of acquiring and holding the TransOcean stock in issue. That is consistent with the basis for liability which is the law of the case, and it is a norm applied when the equitable remedy of rescission is impractical.

■ The appropriate measure and extent of recovery is stated in 12A *Fletcher Cyclopedia Corporations* (Perm.Ed.) § 5598:

"Rescission calls for the cancellation of the bargain and the return of the parties to the status quo and hence where this is impossible because of the disposal or retirement of the stock involved, *the proper measure of damages should be the equivalent value of the stock at the time of resale or at the time of judgment.* (Emphasis added.)

See also *Fletcher*, supra, § 5596, discussing the award of damages by an equity court when rescission is not available because the defendant has parted with the stock.

In *Myzel v. Fields*, 8 Cir., 386 F.2d 718 (1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), the Court affirmed a substantial money judgment in favor of minority stockholders who had sold shares to corporate "insiders" under circumstances in which relevant facts (including those relating to sales and profit) known to the insiders were not disclosed. Since defendants had disposed of the stock they had received, the Trial Court treated the action as one for damages, 386 *F.2d* at 741. The Eighth Circuit determined that under Federal law, 15 U.S.C. § 78cc(b), the sale was void and that,

> "plaintiff was entitled to restitution of what he sold, or, *since restoration of the stock was here impossible, an equivalent money judgment."* (Emphasis added.)

386 *F.2d* at 742.

The Court went on to say that:

> "[r]ecision calls for cancellation of the bargain, and the return of the parties to the *status quo ante* ; where this is impossible because of the disposal or retirement of the stock, then equivalent value of the stock at the time of resale (cf. *In re Liebig*, 2 Cir., 255 F. 458 (1918)) or *at the time of judgment* (cf. *Strong v. Repide*, supra, 213 U.S. [419] at 421–422, 29 S.Ct. 521 [522, 53 L.Ed. 853]), should be the proper measure of damage." (Emphasis in original.)

386 *F.2d* at 742.

Compare *Barnes v. Eastern and Western Lumber Co.*, Or.Supr., 205 Or. 553, 287 P.2d 929 (1955). The *Restatement of Restitution* § 151, which is cited in *Myzel*, makes the same point:

> "Where a person is entitled to a money judgment against another because by fraud, duress or other consciously tortious conduct the other has acquired, retained or disposed of his property, the measure of recovery for the benefit received by the other is the value of the property at the time of its improper acquisition, retention or disposition, or a higher value if this is required to avoid injustice where the property has fluctuated in value or additions have been made to it."

In *Myzel*, the Court concluded that the value of the stock at the time of judgment was the appropriate relief, and noted that the First Circuit had reached a similar conclusion:

> "In *Janigan v. Taylor*, 344 F.2d 781 (1 Cir. 1965), the Court of Appeals for the First Circuit faced a similar problem of damages where the seller of securities was the party defrauded. As Chief Judge Aldrich realistically points out, in such an instance justice required that the 'out of pocket' theory reflect future accretions."

386 *F.2d* at 747.

*Mansfield Hardwood Lumber Co. v. Johnson*, 5 Cir., 263 F.2d 748, *reh. denied* 268 F.2d 317, *cert. denied*, 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 120 (1959), was an action for rescission of sales by plaintiffs to defendants of corporate stock. Defendants had caused the corporation to be dissolved after arranging for it to acquire stock from plaintiffs and others. The Corporation had bought its own shares from plaintiffs in 1953 for about $400 per share; evidence at trial showed a fair market value of about $320 per share. All corporate assets were sold and the corporation was liquidated in 1956. The Trial Court found that,

> "had the plaintiffs and other minority sellers not sold their stock, it would have been worth about $2,068 per share on liquidation or over five times the amount received. The majority stockholders thus profited by some $3,458,007 from the treasury purchases."

263 *F.2d* at 752.

The Court determined that the Trial Judge's ruling was "clearly erroneous in finding that fraud per se of defendant through its officers was established beyond a reasonable doubt ...." 263 *F.2d* at 753. But the Court concluded that the judgment was correct; thus:

> "However, the results were correct and are soundly predicated, we think, upon the liability for breach of the fiduciary duty owed by a corporation's officers to its individual stockholders. Practically

all jurisdictions recognize a fiduciary relationship arising from the directors and officers to their corporation and to the stockholders as a whole, while a 'growing minority' accord this duty to individual stockholders, [4] especially concerning the purchase of stock from a shareholder. Whether this relationship between officers and directors and their stockholders is termed fiduciary or quasi-fiduciary or trust or confidence is immaterial, and, likewise, is it immaterial whether its breach is described as constructive fraud, unjust enrichment, fraudulent breach of trust, breach of fiduciary obligation, gross negligence, or otherwise, and whether the remedy is given by a constructive trust, restitution, or accounting. These are all relative terms describing broad equitable concepts. The standard of a fiduciary's duty to his beneficiary, depending upon the instant relation and the facts of the particular case, lies somewhere between simple negligence and willful misconduct or fraud with the intent to deceive. The actual intent to deceive is not required where one party is so placed in such an advantageous position to the other. Actual fraud will afford redress in the absence of the special relationship."

263 *F.2d* at 754.

And the Court concluded that,

"the special relationship between defendant's officers and the plaintiffs demanded that restitution be made to plaintiffs for the difference of price in their sold shares and their value upon the almost immediate liquidation—especially where the defendant's officers made promises concerning curtailment of future dividends and disclosed plans for no liquidation in the

near future and used economic coercion to secure the sale of the minority shares." 263 *F.2d* at 756.

We agree with the approach taken by the Courts in *Myzel* and *Mansfield Hardwood* and apply it here. Specifically, we hold that Vickers will be required to pay rescissory damages to plaintiffs measured by the equivalent value of the TransOcean stock at the time of judgment.[5] See the discussion below as to when the record was closed for that purpose.

C.

Relying on *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), and similar cases, defendants argue that plaintiff must show injury or economic loss in order to be entitled to a remedy.

■ We do not read *Mills* so narrowly. It was, of course, an action under § 14(a) of the Securities Exchange Act of 1934 in which the question presented was this: "what causal relationship must be shown between such a [materially false or misleading] statement and the merger to establish a cause of action" under the Act? 90 *S.Ct.* at 618.

After concluding that petitioners had established their case "by showing that proxies necessary to approval of the merger were obtained by means of a materially misleading solicitation," 90 *S.Ct.* at 622, the Court reviewed various forms of relief which might be awarded, and determined that petitioners were entitled to receive what they had been led to believe they would get.

In *Mills*, petitioners were on the receiving end of the transaction which had been made possible by the fraudulent misrepresentation. Here, we focus on the principle which

---

4. Delaware law clearly recognizes and enforces such fiduciary relationship. *Singer v. Magnavox Co.*, Del.Supr., 380 A.2d 969 (1977); *Guth v. Loft, Inc.*, Del.Supr., 23 Del.Ch. 255, 5 A.2d 503 (1939); *Allied Chemical & Dye Corp. v. Steel & Tube Co. of America*, 14 Del.Ch.1, 120 A. 486 (1923).

5. Compare the well settled law that entitles a beneficiary to claim all advantages actually

gained by a fiduciary as a result of a breach of trust, 4 *Pomeroy's Equity Jurisprudence* (5 ed.) § 1075; 3 Scott *The Law of Trusts* (3 ed.) § 205; *Bogert Trusts and Trustees* (2 ed. rev.) § 543(V). That standard has been applied to corporate affairs and directors in this State. *Singer v. Magnavox Co.*, supra; *Guth v. Loft, Inc.*, supra.

prohibits a fiduciary from keeping what he *acquired* in a transaction preceded by less than a fair disclosure of facts germane to the transaction. Nothing in *Mills* suggests that, in such a case, a party who gave up what he had must prove injury or economic loss as a condition of relief.

## III

In developing an argument based on a duty to mitigate damages, defendants say that TransOcean stock was traded over the counter and that members of the class could have effected a rescission of the sale, at their respective options, by buying shares on the open market.

■ We agree with the general principle that requires a plaintiff with out-of-pocket damages to mitigate them, *Restatement of Contracts* § 336 (1932), but whether mitigation is required depends upon the circumstances of the case, *R.E.B., Inc. v. Ralston Purina Co.*, 10 Cir., 525 F.2d 749, 756 (1975), and is subject to a rule of reasonableness. *Krauss v. Greenbarg*, 3 Cir., 137 F.2d 569, 573, *cert. denied*, 320 U.S. 791, 64 S.Ct. 207, 88 L.Ed. 477 (1943).

■ Given the fact that liability has been established in the case, we are not persuaded that members of the class waived their respective rights to relief or that they are estopped to assert that right, merely because open market purchases of Trans-Ocean stock might have been made. The purchase of shares at any given time depends on many factors, including the price of the stock, one's view of its potential, a judgment as to management, known corporate policy [6] and, last but by no means least, one's own financial condition, including other investments or commitments in common shares. A mix of those kinds of factors

would undoubtedly produce differing consequences for different shareholders. And another complication arises from the number of TransOcean shares traded.[7]

In support of its contention that plaintiff was obliged to mitigate any out-of-pocket damages by repurchasing the TransOcean shares she had tendered, Vickers relies on *Mitchell v. Texas Gulf Sulphur Co.*, 10 Cir., 446 F.2d 90, *cert. denied*, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971). Whatever the rule of mitigation which one may derive from that case, it is not apposite here.

Texas Gulf Sulphur had issued a press release on April 12, 1964 which, in effect, denied that the Company had found a significant ore deposit in Canada, but corporate insiders had reason to believe that such a deposit had been located. The Trial Court found that the press release was deceptive with respect to material matters and the Circuit Court agreed. 446 *F.2d* at 97. Relying on the press release, plaintiffs and other Texas Gulf Sulphur stockholders sold their shares between April 12 and April 16. On the latter date, Texas Gulf Sulphur issued a second press release which revealed in some detail the facts as to the discovery of the ore deposit. The Court concluded that after the curative statement was published on April 16, stockholders could no longer rely on the deceptive statement and thus were obliged to mitigate any loss sustained after that. 446 *F.2d* at 103.

The Court rejected rescission and restitution as inappropriate remedies for reasons which, on their face, distinguish that case from this: (a) in *Texas Gulf Sulphur*, the sales of the stock were made to unknown third parties through a securities exchange; here, there is "privity" and "direct . . . personal dealings" which the Circuit Court specifically noted were absent, 446 *F.2d* at 105;

---

6. For example: after the merger, Vickers held 88% of the outstanding shares of TransOcean and had announced (in the Offering Circular) its intention to acquire the remainder, by merger if necessary. Vickers' position of overwhelming dominance, in conjunction with its attitude, may have discouraged reinvestment in the Company.

7. Approximately 4,228,000 shares were acquired by Vickers as a result of the tender offer. The record shows that the average trading in TransOcean shares after the tender offer was 600 per day. Clearly, that quantity of trading would not support purchase requirements if all selling shareholders had opted to rescind (on a personal basis) by buying Trans-Ocean on the open market.

(b) such a measure of damages would visit a "hardship . . . upon [Texas Gulf Sulphur] as a corporation," 446 *F.2d* at 105; no such showing (or argument) has been made here. And, finally, the Court made it clear that the *Texas Gulf Sulphur* rule was limited to the "unprecedented circumstances" in that case, and was not one for "broad application to all securities cases." Thus:

"The divergent approaches taken by the litigants verify the suspicion that a set rule of damages has not been tested in this kind of case. Furthermore, because of the uniqueness of the litigation, it would be unwise to set forth a uniform rule with broad applications to all securities cases. Thus, the rule styled by this court is fashioned for these unprecedented circumstances."

446 *F.2d* at 105.

It should also be noted that, unlike Texas Gulf Sulphur, Vickers did not release a corrective press notice or communication to TransOcean stockholders or to those who had sold their shares. Indeed, any obligation to cover would have to be considered in light of the Chancellor's finding after the trial on liability that the TransOcean stock was actually worth less than $12 per share.

Requiring plaintiff to mitigate her damages under the record circumstances would be unreasonable, or, to put it more accurately, in the factual setting of this case, we refuse to deny to members of the class relief which would otherwise be available to each of them, or to limit such relief because he or she had not repurchased TransOcean stock after learning of the misrepresentation.

### IV

For the guidance of the Trial Court after remand, we make three other comments about relief.

■ First, rescissory damages are to be determined as of or prior to the date on which the trial on damages ended, that is,

July 15, 1978. The parties agreed to close the record on that date and it is the date by which damages are ordinarily proved. It also seems to be a reasonable accommodation between the date on which the shares were sold (1974) and the date on which a third trial will be held (1981).

Second, at trial each side offered experts with impressive credentials who testified to a range of values running from $10 to about $41.40 for each share of TransOcean common. As we understand the record, much of the difference was grounded in the respective values assigned to TransOcean's assets. And the value which the Chancellor fixed was influenced significantly by the percentage which he assigned to assets in the formula he used. It seems to us that assigning the same factor (40%) to both asset value and to market value was highly questionable. We say this because oil was (and is) a limited and much needed energy source which significantly affected its value as a corporate asset; in contrast, Vickers' dominance of TransOcean and its announced plan to acquire all of the TransOcean stock undoubtedly had an influence on the value assigned by the market to the shares traded.[8]

Third, in determining the amount of rescissory damages, the Court should be considering a TransOcean per share price between a minimum of $15 and a maximum of $41.40. The stock should not be valued at less that $15 per share, because that was the amount Vickers had authorized to be paid to third parties for open market purchases of TransOcean stock. Given the fiduciary relationship, the arms-length bargaining employed in the purchases should not have resulted in the minority stockholders receiving less than Vickers was ready to pay strangers for the same stock. And, by the same token, plaintiff should not be permitted to now seek more than the maximum amount she has sought to date, that is, $41.40 per share.

8. One expert who testified for plaintiff noted that, after Vickers had acquired some 88% of the outstanding shares of TransOcean, the market price was artificially low because of the "inability to float," that is, there were insufficient shares available (the average trading was about 600 shares per day) to permit large investors to buy the stock.

 Finally, before any judgment is entered, Vickers is entitled to credit for the $12 which it paid to each member of the class for each share of TransOcean stock it purchased. And it is entitled to credit for interest on that sum in the hands of the seller. In other words, Vickers is entitled to credit arising from the fact that plaintiff (and each other member of the class) has had the use of $12 per share since the transaction was made in October 1974. *Dick v. Reves*, Del.Supr., 206 A.2d 671, 676 (1965); *Hegarty v. American Commonwealths Power Corp.*, Del.Ch., 19 Del.Ch. 86, 163 A. 616, 619 (1932); *Baumel v. Rosen*, D.Md., 283 F.Supp. 128 (1968), modified, 4 Cir., 412 F.2d 571 (1969), *cert. denied*, 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681 (1970). However, we cannot accept the 13.1% rate of return which was imposed by the Trial Court without explanation. Considerations of fairness play a part in fixing an interest rate, *Board of Commissioners v. United States*, 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1939); *Small v. Schuncke*, N.J.Supr., 42 N.J. 407, 201 A.2d 56 (1964), and here we are reviewing a rate which is without Delaware precedent,[9] in a situation in which the victims of a breach of fiduciary duty will be paying interest to the violators. Invoking the fairness principle in this factual setting, and by analogy to the statutory interest rate at the time of the trial on damages, 6 *Del.C.* § 2301(a),[10] and the rate applied in appraisal cases, we conclude that interest at the rate of 7% is fair. Compare *Baumel*, supra, in which the Court required plaintiffs to pay "simple interest at the rate of 5%," an amount which the Court concluded they could have "safely

earned" by use of the money. 283 *F.Supp.* at 148.

## V

In conclusion, we turn to the arguments made by three of the individual defendants, Stormy F. Smith, William A. Alexander and Edward J. Hudson. All of them were Directors of TransOcean, and Smith was the President of the Company.

In their prior appeal, these defendants argued that they were exonerated from any personal liability because of good faith reliance upon the advice of counsel, because of the business judgment rule and for other reasons. The Court of Chancery had not ruled on those contentions, nor did we. We remanded, saying,

> "We make no judgment or comment about the ultimate liability of any individual defendant nor of any defense alleged, except to direct that on remand the Trial Court consider such matters and make whatever findings and state whatever conclusions it deems appropriate as part of its final judgment."

383 *A.2d* 282. Because the Chancellor again found for all defendants he did not consider the personal status of Smith, Alexander and Hudson.

Defendants have renewed their arguments that proper application of the business judgment rule, see *Warshaw v. Calhoun*, Del.Supr., 221 A.2d 487 (1966); *David J. Greene and Co. v. Dunhill International, Inc.*, Del.Ch., 249 A.2d 427 (1968), exonerates them from personal liability. Plaintiff, on the other hand, contends that the issue is

---

**9.** Compare the amount of interest allowed in the appraisal cases: In *Gibbons v. Schenley Industries, Inc.*, Del.Ch., 339 A.2d 460 (1975), the Chancery Court awarded 5.73% in interest, and in *In Re Creole Petroleum Corp.*, Del.Ch., C. A. 4860 (New Castle County), 1978, interest at the rate of 7% was ordered; in *Universal City Studios, Inc.*, supra, interest of 5.23% was awarded. And in *Felder v. Anderson, Clayton & Co.*, 39 Del.Ch. 76, 159 A.2d 278 (1960), interest was fixed at the rate of 4¾%; in *Sporborg v. City Specialty Stores, Inc.*, 35 Del.Ch. 560, 123 A.2d 121 (1956), a rate of 4% was fixed.

**10.** 6 *Del.C.* § 2301(a) then provided, as follows:

> "The legal rate of interest for the loan or use of money, where no express contract has been made for a less rate, shall be 6 percent per annum, except that any borrower may agree to pay, and any lender may charge and collect from such borrower, interest at any rate agreed upon in writing in excess of 6 percent per annum, but not in excess of 4 percent over the discount rate charged by the Federal Reserve Board of Governors to its member banks."

See 62 *Del. Laws* c. 228, effective April 18, 1980, for the current Statute.

not properly before us and, in any event, the business judgment rule does not apply.

We think the time has come to end this lawsuit against these defendants. We have determined that plaintiff and the members of her class are entitled to a new trial on damages arising from the transaction by which Vickers acquired the stock owned by each of them, respectively. That relates only to the class claim against Vickers, which had bought the TransOcean shares. We are unable to perceive, on the present record and from the briefs, any basis for liability against these individual defendants which arises from or which is related to our determination that Vickers must pay rescissory damages to the class. It follows, therefore, that these defendants are entitled to judgment and, accordingly, so much of the order of the Court of Chancery entering judgment in their favor will be affirmed.

We should add that, in lengthy briefs, each side argued a number of propositions not specifically reviewed herein. Our failure to do that reflects a decision as to what to write about, not a failure to consider all arguments.

Affirmed in part, reversed and remanded for proceedings consistent herewith.

QUILLEN, Justice, with whom McNEILLY, Justice, joins, dissenting:

I respectfully dissent. Since my view has not persuaded by colleagues, and therefore is of no effect, I will state it as briefly as I can.

It should be noted that in this litigation there never has been any judicial disagreement over the "complete candor" test. See the Chancellor's initial 1976 opinion. *Lynch v. Vickers Energy Corporation*, Del.Ch., 351 A.2d 570, 573 (1976).[1] There can be and is

none now. Moreover, as to the two particular facts cited as violations of fiduciary duty in this Court's initial opinion, *Lynch v. Vickers Energy Corp.*, Del.Supr., 383 A.2d 278 (1977), *reh. denied* (1978), the application of the legal test to the facts is the law of the case and not open to review again. Compare *Massey-Ferguson, Inc. v. Wells*, Del.Supr., 421 A.2d 1320 (1980).

It should also be noted that this Court in its 1977 reversal of the Chancellor's 1976 opinion "remanded [the case] for proceedings consistent herewith." 383 A.2d at 282. Nothing in the Chancellor's latest effort, *Lynch v. Vickers Corp.*, Del.Ch., 402 A.2d 5 (1979), violated that mandate as no guidance was given as to damages, let alone any suggestion that a single rule of damages mandatorily governed.

While I find the opinion of the majority to be well-stated, I am primarily concerned about the implications of the decision on the discretionary power of the Chancellor and the consequent implications on the corollary role of this Court in the evaluation of evidence and choice of relief.

Insofar as today's majority suggests that the Chancellor as a matter of law did not have discretion to apply an out-of-pocket, appraisal damage remedy, it seems to me the opinion is in error. 1 *Pomeroy's Equity Jurisprudence* (5th ed. 1941) § 109. See also *Wilmont Homes, Inc. v. Weiler*, Del.Supr., 202 A.2d 576, 580 (1964); *Tenney v. Jacobs*, Del.Supr., 43 Del.Ch. 526, 240 A.2d 138, 140 (1968); *Wilmington Trust Company v. Barry*, Del.Supr. 397 A.2d 135, 138 (1979). "Equity adapts its decrees to fit the nature and gravity of the breach and the consequences to the beneficiaries and trustee." Bogert, *Trust & Trustees* (2d ed. rev. 1978) § 543(V), p. 387. It is one thing to analogize to the disloyal trustee of an express

1. Indeed, if anything, the Chancellor's 1976 statement of the law seems stronger than others uttered by Delaware courts. See Resource Document on Delaware Corporation Law, 3 Del.J.Corp.L. 20, 26–29, particularly n. 38 (1977); *In re TransOcean Tender Offer Securities Litigation*, N.D. Ill., 427 F.Supp. 1211, 1220–1221 (1977). Compare *Lynch v. Vickers Energy Corp.*, Del.Supr., 383 A.2d 278, 281

(1977) incorporating federal standards in the definition of "germane". Compare *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757, 766 (1976). I note this not to disagree with such incorporation, which makes good sense, but rather to emphasize the Chancellor's contribution to and empathy for the legal standard of liability.

trust who uses trust property for personal benefit but it is quite another to be absolutely bound by that analogy to the exclusion of all others. To say there is a fiduciary duty "only begins analysis" and "gives direction to further inquiry." *Securities and Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 86, 63 S.Ct. 454, 458, 87 L.Ed. 626, 632 (1943). Given the Chancellor's emphasis on the situation before him, I find no legal error in his giving by analogy discretionary consideration to the methodology used in *Poole v. N. V. Deli Maatschappij*, Del.Supr., 43 Del.Ch. 283, 224 A.2d 260 (1966). Compare *Blackie v. Barrack*, 9th Cir., 524 F.2d 891, 909 (1975).

The real question is whether the Chancellor abused his discretion in choosing the remedy he did. His choice appears to have been motivated by at least three factors.

First, he relied on the evidence before him after ten trial days over a three-month period in the second trial after remand. 402 A.2d at 10, 12–13. In choosing the remedy, he took the case as he found the evidence warranted. I cannot say his view of the evidence, insofar as choice of remedy is concerned, was wrong.

Second, and more particularly, he properly and carefully made an assessment of the nature of the particular fiduciary duty involved in the factual context and found it "not as compelling" as some others. 402 A.2d at 11. Insofar as the opinion of the majority may suggest that the two particular nonfraudulent breaches of fiduciary duty found in this Court's first opinion were ones of major culpability and may take issue with the Chancellor on that account, not only are the Chancellor's views entitled to the usual deference given those of the fact-finder, but, in my judgment, he clearly has the better of the argument.

Third, the Chancellor in passing viewed the issue of mitigation of damages differently than the majority. 402 A.2d at 8–9. Since the omissions creating the two breaches were publicly disclosed not later than the first trial in 1975 and the price of Trans-Ocean stock remained below twelve dollars a share in the limited market, it is difficult for me to say from the appellate perch that it was legally improper to consider that "no genuine effort to replace tendered shares appears to have been made". 402 A.2d 9.

There was, in my judgment, no abuse of discretion in the remedy chosen. I recognize the legal forest involves an important principle of accountability, but I fear the Court has lost track of the factual trees and the prime responsibility of equity to focus on the determined circumstances of the case at hand. Courts of equity in particular decide cases.

Were the thoughtful opinion of the majority an opinion of the Trial Court, it would be entitled to deference. But it is not. This is emphasized by the particularly distressing chronology of this case. The complaint was filed on October 18, 1974. A multi-week trial was held in May and June of 1975. After this Court's initial opinion, a second trial was held in May, June and July of 1978. The decision today will require yet a third trial, on a mandated damage theory, presumably in 1981. Given the history, surely we must question whether we have our appellate role in perspective. *Application of Delaware Racing Ass'n*, Del.Supr., 213 A.2d 203, 207 (1965).

The luxury of dissent makes it unnecessary for me to determine whether or not the Chancellor's application of the appraisal remedy to these facts as of September 1974 reached a clearly erroneous result. Rather than face that difficult question to no effect, I will merely refer any overzealous, surviving reader to the general comments of my concurrence in *Bell v. Kirby Lumber Corp.*, Del.Supr., 413 A.2d 137, 150–51 (1980).